J-S07001-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: ADOPTION OF G.X.E. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.M.E., NATURAL FATHER | No. 1537 MDA 2014 |

Appeal from the Decree Entered August 15, 2014
In the Court of Common Pleas of Franklin County
Orphans' Court at No(s): 6 Adopt 2014

| | |
|---|---|
| IN RE: ADOPTION OF S.L.E. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.M.E., NATURAL FATHER | No. 1557 MDA 2014 |

Appeal from the Decree Entered August 15, 2014
In the Court of Common Pleas of Franklin County
Orphans' Court at No(s): 7 Adopt 2014

BEFORE: BENDER, P.J.E., OLSON, J.and OTT, J.

MEMORANDUM BY BENDER, P.J.E.: **FILED FEBRUARY 27, 2015**

S.M.E. (Father) appeals from the August 15, 2014 decrees that involuntarily terminated his parental rights to S.L.E. (born in September of 2010) and G.X.E. (born in September of 2011) (Children) pursuant to 23 Pa.C.S. § 2511(a)(1), (2) and (b).[1] We affirm.

M.D. (Mother) filed termination petitions in which she asserted *inter alia* that A.A. (Stepfather), her present husband, wished to adopt the Children. A hearing was held on June 3, 2014, after an attorney was

---

[1] Father's appeals from the two decrees were consolidated *sua sponte* by order of this Court, dated October 7, 2014.

appointed to represent Father. On August 5, 2014, the court issued two identical opinions setting forth the factual and procedural background of the case, its findings relating to the testimony presented, and its reasons for determining that Father's parental rights should be terminated. On August 15, 2014, the court issued two decrees terminating Father's parental rights to both Children. Father filed timely notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). On October 1, 2014, the court issued two identical opinions pursuant to Rule 1925(a)(2)(ii) in which it addressed the seven issues raised by Father in his concise statements. Essentially, the court relied on its August 5, 2014 opinions, citing to pages in those decision that addressed Father's issues. These appeals are now ripe for review.

In his brief, Father raises the following issues:

I. Did the trial court err in considering testimony excluded from evidence in its opinion and decree terminating Father's rights?

II. Did the trial court err in terminating Father's parental rights under 23 Pa.C.S.A. § 2511(a)(1) and § 2511(a)(2) when Father was incarcerated the entire six-months preceding filing of the Petition, utilized services and programs while incarcerated, attempted to contact the Children through Mother and Mother's family, and whose sentence is not of such a length that his inability to presently care for the [C]hildren cannot be remedied in the near future?

III. Did the trial court err in determining there was sufficient evidence that termination of Father's parental rights would best serve the developmental, physical, and emotional needs and welfare of the Children?

Father's brief at 9.

- 2 -

When considering an appeal from an order involuntarily terminating parental rights, we are guided by the following:

> In cases involving termination of parental rights, our scope of review is broad. All of the evidence, as well as the trial court's factual and legal determinations, are to be considered. However, our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child. We have always been deferential to the trial court as the fact finder, as the determiner of the credibility of witnesses, and as the sole and final arbiter of all conflicts in the evidence. *In re S.D.T., Jr.*, 934 A.2d 703, 705-06 (Pa. Super. 2007), *appeal denied*, 597 Pa. 68, 950 A.2d 270 (2008) (citations omitted). The burden of proof in a termination case is on the petitioning party, who must establish valid grounds for termination by clear and convincing evidence.

*In re E.M.I.*, 57 A.3d 1278, 1284 (Pa. Super. 2012) (quoting *In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

We have reviewed the certified record, the briefs of the parties, the applicable law, and the comprehensive opinions authored by the Honorable Shawn D. Meyers of the 39th Judicial District—Franklin County Branch, issued on August 5, 2014 and October 1, 2014. We conclude that Judge Meyers' thorough, well-reasoned opinions properly dispose of the issues raised by Father. Accordingly, we adopt Judge Meyers' opinions as our own and affirm the decrees appealed from on that basis. Additionally, as requested by the trial court, we remand the cases to the trial court for the limited purpose of correcting the decrees as outlined in Judge Meyers' October 1, 2014 opinions.

Decrees affirmed.  Cases remanded.  Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/27/2015

Aug. 5, 2014

## IN THE COURT OF COMMON PLEAS OF THE 39TH JUDICIAL DISTRICT OF PENNSYLVANIA -- FRANKLIN COUNTY BRANCH

In Re Adoption of

~~G. X. E.~~

:
:
:
:
:
:
:
:

ORPHANS' COURT DIVISION

No. 6-ADOPT-2014

Honorable Shawn D. Meyers

## OPINION

*M. D.*

This Opinion addresses Petitioner/Mother's, ~~████████~~, petition to terminate

*S. M. E.*

the natural rights of Respondent/Father, ~~████████████~~.

### FACTUAL AND PROCEDURAL HISTORY

*S. L. E.*

The parties are natural parents of two minor children: ~~████████████~~, born

*G. X. E.*

September █, 2010, and ~~████████████~~, born September ██ 2011. Mother and

Father previously resided together with the children. They separated as a couple in May

*A. A.*

of 2011, but continued to reside together. Mother is currently married to ~~████~~

~~████~~, the children's stepfather. He has resided with the children since July of 2012.

Father previously served in the military and was deployed twice. Father was first

deployed to Iraq in 2008. Father served in Afghanistan from May of 2012 - May of

2013, which involved short periods of active service and training. In September of 2011,

Father was arrested for sexual assault of another man in Maryland. Father entered a

guilty plea on July 10, 2013.

2

Mother filed a Petition for Involuntary Termination of Parental Rights on February 24, 2014, seeking to terminate Father's rights in anticipation of an adoption by Mother's husband, the children's stepfather. This Court set a hearing on May 9, 2014. Upon receipt of pro se correspondence from Father, indicating the desire to proceed with counsel, the Court appointed counsel to represent him. Father's first two appointed attorneys had conflict issues, and the Court subsequently appointed Kristin Nicklas as Father's counsel. The Court continued the hearing to June 3, 2014 in order to ensure that Father had adequate time to consult with his counsel.

The parties appeared on June 3, 2014 for the involuntary termination hearing. The Court heard testimony from both sides, and subsequently set a briefing schedule for the parties. Mother filed her brief in support and Father filed his brief in opposition. This matter is now ready for decision.

## DISCUSSION

I. Applicable Timeframe for the Court's Determination:

This Court will first address the relevant timeframe for its decision. In his brief, Father raises an argument he previously raised before the Court. At that hearing, counsel for Mother first called Stepfather as a witness. Stepfather was asked several questions about his past involvement with the children and Mother, at which point counsel for Father objected. Counsel for Father argued that the questions reflected content that was not included in the petition, and thus the witness was impermissible testifying to facts not previously pled. The Court sustained the objection in part, finding that if counsel for Mother sought to develop certain facts and to support certain grounds for termination, those facts should have been properly pled in the petition. Counsel for Mother was

3

instructed to move on from questions regarding stepfather's own involvement with the children, and focus on Stepfather's knowledge of Father and his involvement with his children.

In his brief, Father argues that Mother's petition includes only one relevant fact for the Court's consideration: the averment that Father "has had no contact with [Mother] since April 2013 and is currently serving a sentence in Maryland for sex offense(s)." Father argues that Mother is precluded from offering evidence of facts that occurred prior to April 2013 in support of any grounds for termination.

This Court agrees that any potential ground for termination must be sufficiently alleged in the petition. As previously stated at the hearing, any facts regarding Stepfather's prior relationship with the children that were not included in the petition would not be relevant to this Court's determination on Father's parental rights. It is well-settled that "[t]he focus of the termination proceeding is on the conduct of the parent and whether his conduct justifies termination of parental rights." In re B.,N.M., 856 A.2d 847, 854-55 (Pa. Super. 2004). Notably, such conduct includes Father's actions during the six month period preceding the termination petition, but also encompasses the time before that. In re B.,N.M., 856 A.2d at 855 ("Although it is the six months immediately preceding the filing of the petition that is most critical to the analysis, the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision."). The Court will now address the legal grounds for involuntary termination and the evidence submitted by both parties.

4

II.     Applicable Standard – Involuntary Termination of Parental Rights:

Section 2511 of the Adoption Act governs termination of parental rights. The statute requires this Court to engage in a bifurcated analysis to determine if termination is warranted. In interpreting Section 2511, the Pennsylvania Courts have set out this analysis as follows:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

In re I.E.P., 87 A.3d 340, 344 (Pa. Super. 2014) (quoting In re L.M., 923 A.2d 505, 511 (Pa. Super. 2007)). Thus, the Court must first look to the grounds for involuntary termination, and then proceed into the analysis of the needs and welfare of the children.

The grounds for involuntary termination are found in Section 2511(a) of the Adoption Act. In this case, Mother asserts the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa. C.S.A. § 2511(a)(1), (2).

5

The party seeking termination must establish, by clear and convincing evidence, "that grounds existed for terminating Father's parental rights." In re Z.S.W., 946 A.2d 726, 728-29 (Pa. Super. 2008). This means that Mother must present evidence that "is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." In re Z.S.W., 946 A.2d at 728-29 (quoting In re J.D.W.M., 810 A.2d 688, 690 (Pa. Super. 2002)). The Court must consider the totality of the situation, "examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights," in order to determine if termination is warranted by the circumstances. In re B.,N.M., 856 A.2d at 855. With this framework in mind, the Court will now consider Mother's termination petition.

III. Analysis Under Section 2511(a) - Evidence in Support of Terminating Father's Parental Rights:

a. Termination Pursuant to Section 2511(a)(1):

As stated above, the relevant inquiry under subsection (a)(1) is whether there has been a "settled purpose of relinquishing parental claim" to the minor children by Father, or whether Father has "refused or failed to perform his parental duties." The Pennsylvania Supreme Court has explained "parental duties" as follows:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance. This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

6

In re Burns, 379 A.2d 535, 540 (Pa. 1977) (citations omitted). Thus, the courts place upon a parent an *affirmative* duty. See, e.g., In re B.,N.M., 856 A.2d at 855 ("Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances."). This Court must determine whether Father has "failed or refused to perform parental duties . . . in relation to the particular circumstances of the case." In re Burns, 379 A.2d at 540.

### 1. *Father's Efforts to Contact the Children During his Active Service:*

Mother asserts that Father has not served in his parental role since May of 2012. Mother argues that Father has not provided financial support to the children, or any parental support for the children, for several years. From May 2012 until March 2013, during his period in Afghanistan, Mother avers that Father did not communicate with the children in any way. Father did not attempt to communicate with the children on their birthdays or holidays. Father did not send the children letters, cards, or emails. According to Mother, the only contact Father had with the children was when he sent them each a teddy bear on January 13, 2013. Mother did testify on rebuttal however, that she only recalls two times during the ten months that Father served in Afghanistan did he utilize Skype to communicate with the children.

Father stated that on November 27, 2013, he mailed Mother a letter to read to the children. Father used Mother's address in Maryland, where he believed she was residing. According to Father, the letter was returned to him marked "return to sender." Father then forwarded that letter to Mother's cousin, Marjorie Jean. At the hearing, Ms. Jean testified to this, stating the letter was dated November 27, 2013, addressed to Mother at

7

her address in Hagerstown, Maryland. Father wanted Ms. Jean to send the letter to Mother, but she testified that she did not wish to do that as she was not getting along with Mother at the time. Ms. Jean stated that the "return to sender" on the envelope was in Mother's handwriting. When asked where the envelope was, Ms. Jean said that she shredded the envelope but kept the letter.

Father also presented testimony from Deborah Cotes, Father's aunt. She testified that she sent a package to Mother, containing Christmas gifts for the children, but Mother did not open the package. According to Ms. Cotes, Father knew of the package but it was not actually from him, it was from her.

### 2. *Father's Efforts to Spend Time with the Children Upon his Return*:

In her brief, Mother cites three occasions where Father saw the children. Upon Father's return from Afghanistan in March of 2013, Mother and the children met him at the airport. Mother states that the meeting was brief. It was at that time that Father learned that Mother and the children no longer lived in their former marital home. Two months later, in May of 2013, Father visited with the children for approximately an hour and a half. In June, Father and the children "crossed paths" while visiting a relative's home. According to Mother, that was the extent of Father's efforts to parent or spend time with the children.

Father argues that he attempted to see the children "numerous times, estimated to be approximately twenty (20) times, from May 2013 until he was incarcerated in August 2013." Father does not provide any specific dates or context for that assertion. Father asserts that Mother prohibited contact between he and the children, except for two instances where the parties went to dinner, and where the children spent time with Father

8

at their home. Mother states that neither she nor her husband have acted in any way to prevent Father from exercising his parental rights.

In support of his argument that Mother erected obstacles, Father avers that Marjorie Jean wrote an email to Mother in May of 2013, stating that it was not a good idea for her to "keep the children away from their Father." Father also draws attention to Mother's testimony that the children refer to her husband as "dad" and therefore it would be confusing for them to be involved with their Father.

### 3. *Father's Efforts to Contact the Children During his Incarceration*:

. Father has been incarcerated in Maryland since August of 2013. Father was placed in county jail for approximately two months prior to his incarceration. Father testified that while in county jail, he was unable to send any letters or make any phone calls. Father claims that he pleaded with Mother to see the children prior to his sentencing date in August, but she refused. Father avers that Ms. Jean overheard that conversation. Mother states that Father has not attempted to contact the children while he has been incarcerated.

On direct examination, Father first testified that it was his understanding that because his cell phone was inactivated, that meant Mother's cell phone was also turned off. He stated that he could not call the place of her employment because they do not accept collect calls. Father testified that he asked Ms. Jean to get Mother's work address but she declined to do so. Father did not send any letters to Mother to be forwarded to her address. Father testified that he would ask Ms. Jean if she had heard from the children. Mother stated that she maintains the same work address and phone number she

9

had when she and Father were together, and thus Father had the resources to contact Mother about the children.

On cross-examination by Mother's counsel, Father was asked if, from May 2013 to August 2013, he had taken any steps to enforce his legal rights as a Father, i.e., going through the court system. Father testified in the negative. He indicated that it was not in his nature to "bring it all into the court system like that." He also stated that "at that time, I was too wrapped up in all kinds of legal stuff I didn't want to see any lawyers," presumably referring to the criminal action in Maryland. When asked what he was doing during this time, he stated that he was making preparations "for every possible outcome," which included looking for work and moving to Ms. Jean's home.

On cross-examination by the Guardian ad Litem, Father testified that he did have the ability to make calls from his the facility in Jessup. There does not appear to be a limit on how many calls he can make as an inmate, but there are a limited number of phones to use. Father testified that he can send letters out but he must pay for postage. His family sent him money to buy postage at the jail, if he knew the correct address.

On cross-examination by Mother's counsel, Father was asked about his lack of communication from the time he was arrested until the hearing date. Father indicated that he did not have enough money to send letters to the children prior to November of 2013. Father states in his brief that, because of his unsuccessful attempts at contacting the children, he did not wish to send additional letters or make additional phone calls. He states that Mother erected intentional barriers to his communication which prevented Father from reaching out to his children, and he tried "over and over" to make contact with the children with no success. Because he was not successful in those efforts, Father

10

did not pursue additional efforts. For further explanation, Father cites the definition of insanity attributed to Albert Einstein ("doing the same thing over and over again expecting different results"), and argues that for him to continue the same action (attempting to contact his children) while expecting different results (from Mother) would be insanity.

### 4. *The Court's Findings*:

This Court finds that the threshold under Section 2511(a)(1) has been met. Regarding the time that Father served in Afghanistan, he argues that it is improper to consider that period in support of terminating his parental rights. This Court is not using the mere fact that Father was deployed overseas for a period of time as support of terminating his rights. A parent's deployment overseas is not in itself a supporting factor. See, e.g., In re Bowman, 666 A.2d 274, 279 (Pa. 1995) (recognizing that military service and employment made father's "ability to perform his parental duties more difficult"). Being in active military service however, "do[es] not relieve [the parent] of all parental responsibility." Bowman, 666 A.2d at 279. That parent is required to affirmatively act to "to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." In re B.,N.M., 856 A.2d at 855. The Court finds that Father failed to live up to this affirmative duty. Mother testified as to Father's lack of commination with the children during this time. Father sent no letters to the children, but sent them each a teddy bear near the end of his service time. Mother testified to only two instances during Father's deployment that he communicated with the children via Skype. Father presented testimony that he did send one letter to Mother, by way of her cousin, but it never got to her. Even if this Court accepts that as true, sporadic attempts at communication do not

11

satisfy the affirmative duty of a parent. Father's knowledge of his aunt's Christmas gifts to the children also does not fulfill his obligation, as it was clear that the gift was not actually from Father, but from his aunt.

As to Father's efforts upon his return from Afghanistan up until the hearing date, the Court finds the type of passive acceptance Father has displayed towards his relationship with his children to be troubling, and in complete opposition to what the law requires of a parent. "[T]he parental obligation is a positive duty which requires affirmative performance." In re Burns, 379 A.2d 535, 540 (Pa. 1977). This is an "affirmative duty," that requires "continuing interest in the child and a genuine effort to maintain communication and association with the child." Id. Father's sporadic interaction with his children upon his return from military service does not fulfill this affirmative duty. This duty requires action by the parent.

Father cannot "yield to every problem" that presents itself, and must take steps to maintain the relationship with his children, "to the best of his or her ability, even in difficult circumstances." In re B.,N.M., 856 A.2d at 855. Certainly upon his return Father was faced with difficult circumstances, and the Court acknowledges as such. Father returned to find out that Mother and the children no longer resided in the home. Mother had taken up a relationship with another man. Regardless of those types of difficulties, the law requires a parent to be a parent.

This is true regardless of any "obstacles" put in place by the other parent. As discussed at the hearing, Father had the option of, if nothing else, pursue his legal rights as a parent through the court system. Father's explanation as to why he chose not do to that did not focus on any action by Mother, but on Father's ongoing legal troubles and the

12

unstable nature of his life at that time. This is not a "genuine effort" to maintain contact with the children. Father's claim that any further attempts to contact the children, after numerous failed attempts, would be the definition of insanity does not hold true to this Court. Passive acceptance has no place in the context of an affirmative duty.

The fact that Father is incarcerated is not itself a ground for terminating his parental rights. However, the affirmative parental duty applies even if a parent is incarcerated. In re B.,N.M., 856 A.2d at 855 ("[A] parent's responsibilities are not tolled during incarceration."). The Court must focus on "whether the parent utilized those resources available while in prison to maintain a relationship with his child." In re Adoption of Dale A., II, 683 A.2d 297, 302 (Pa. Super. 1996). Moreover, "while the fact that a parent is incarcerated may make it more difficult to parent in a traditional fashion, the fact of incarceration alone does not obviate the duty to exercise reasonable firmness under the circumstances to maintain a secure parent/child bond." In Interest of A.P., 692 A.2d 240, 245 (Pa. Super. 1997).

The Court finds that this burden was not met here. Father cited numerous reasons for his failure to maintain communication with his children from prison. Father indicated that he was unsure of Mother's current address or telephone number. Mother maintains that none of that information has changed. Father did not present any documentary evidence to the Court showing any changes in address or phone number. Father stated that he asked members of his family for Mother's phone number and asked Ms. Jean for Mother's phone number with no results. Father did not explain why he failed to confirm Mother's address prior to his incarceration, when the parties were living separately. Father testified that he had the means to purchase postage in jail, and the means to send

13

letters from prison, but did not know where to send them. Even if the Court accepts all this as true, Father still had a duty to attempt to overcome the difficulties he faced. See, e.g., In re B.,N.M., 856 A.2d at 857 ("Father failed to act to the best of his ability to meet his obligation despite his incarceration and the obstacles Mother placed before him.").

Father did not send any letters to Mother at her old address to be forwarded to any new address. Father had the means to file something with this Court by mail, or even send a letter to the Court, setting out the situation with the children, but he did not do so. While the failure to seek court involvement is not in itself a reason to terminate a parent's rights, it is certainly a relevant consideration when taken in tandem with all the circumstances of this case. See In re Adoption of L.J.B., 18 A.3d 1098, 1122 (Pa. 2011). The case presented here is not one where one parent has presented diligent, consistent, and resolute efforts to overcome any deliberate and devious obstacles put in place by the custodial parent. In re J.W., 578 A.2d 952, 959 (Pa. Super. 1990) ("[A]dequate parenting requires *action* as well as *intent*."). This is a case of one parent's passive acceptance of the difficulties put before him; some of which may by the custodial parent, and some of which are the products of the other parent's actions and overall situation. For all the foregoing reasons, this Court finds that there is clear and convincing evidence to support the termination of Father's parental rights under Section 2511(a)(1).

5. *Analysis Under Section 2511(b) – Effect of Termination on the Needs and Welfare of the Children*:

As stated above, once the Court has found that that termination of parental rights is warranted, the Court must then determine "the needs and welfare of the child under the standard of best interests of the child." In re D.A.T., 91 A.3d 197, 204 (Pa. Super. 2014) (citation omitted). This inquiry involves consideration of "[i]ntangibles such as love,

14

comfort, security, and stability are involved," as well as "the nature and status of the parent-child bond." In re C.M.S., 884 A.2d 1284, 1287 (Pa. Super. 2005). The Court must consider the effect that terminating Father's parental rights will have on the needs and welfare of the children. In re Adoption of Godzak, 719 A.2d 365, 368 (Pa. Super. 1998). There is great importance to "the bond between a child and his or her natural parent." In re Adoption of Godzak, 719 A.2d at 368 (citing In re E.D.M., 708 A.2d 88 (Pa. 1998). Regarding this consideration, the Superior Court has stated that:

> It is universally agreed that the bond of parental affection is unique and irreplaceable. When parents act in accordance with the natural bonds of parental affection, preservation of the parent-child bond is *prima facie* in the best interest of the child, and the state has no justification to terminate that bond. On the other hand, a court may properly terminate parental bonds which exist *in form* but not *in substance* when preservation of the parental bond would consign a child to an indefinite, unhappy, and unstable future devoid of the irreducible minimum parental care to which that child is entitled.

In re J.W., 578 A.2d 952, 958 (Pa. Super. 1990) (citations omitted). Moreover, "[i]t is important to keep in mind that the essential *needs* of the child and the *responsibilities* of the parent must be considered as well as the *rights* of the parent." Id.

Father argues that the record is devoid of any evidence regarding the effect that termination of his rights would have on the needs and welfare of the children. This Court does not agree. The Court was presented with evidence that the children have no bond whatsoever with Father. Stepfather has lived with Mother and the children since July of 2012. Stepfather testified that the children began referring to him as "dad" around the fall of 2012. He stated that the children have never mentioned natural Father, and testified that he is unsure that the children would even know who Father was. Stepfather testified that he provides for the children, including daily physical and emotional needs. The children embrace Stepfather and Mother as their family, along with their four month

15

old sibling, who is the natural daughter of Stepfather and Mother. The Court was presented with credible evidence that the children currently have a stable and well provided for life with Mother and Stepfather, one filled with "love, comfort, security, and stability." In re C.M.S., 884 A.2d at 1287. The children's needs are being met on a daily basis and they have an established family dynamic.

What is absent from the record is evidence of a bond between the children and natural Father. The Pennsylvania Courts have held that "in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists," and therefore "the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case." In re Adoption of J.M., 991 A.2d 321, 324 (Pa. Super. 2010) (quoting In re K.Z.S., 946 A.2d 753, 762–63 (Pa. Super. 2008)). In this particular case, the Court was presented with evidence that there is no bond between the children and Father. The children's father figure is their Stepfather, who has been children's *de facto* parent for many years, and it is between Stepfather and the children that the Court finds the existence of a parental bond. See, e.g., In re Adoption of J.M., 991 A.2d at 324-25 (finding that maternal grandfather was "*de facto* parent," as he performed Father's parental duties since child's birth, including financial and emotional support, and noting that maternal grandfather "desires to fill the void created by Father's inaction."); In re J.T., 983 A.2d 771, 777 (Pa. Super. 2009) ("[T]here is no record evidence of a bond between J.T. and Mother. A parent-child bond exists between J.T. and her foster parents, who wish to adopt her."). For all the foregoing reasons, this Court cannot find that the children's needs or welfare would be harmed in any way by terminating natural Father's parental rights.

16

### b. Termination Pursuant to Section 2511(a)(2):

This Court will now discuss termination of parental rights under subsection 2511(a)(2), the second statutory ground cited by Mother. Under that section, the relevant inquiry is into the "repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being," as well as the "conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent."

In her brief, Mother draws attention to Father's incarceration. Mother argues that "the fact that ███████ *S.M.E.* has been and will continue to serve a sentence of incarceration" meets the definition of "incapacity" outlined in Subsection (a)(2). Mother argues that this incapacity is one that cannot be remedied as Father will continue to be incarcerated until he has served his sentence. Father argues that his incarceration cannot be used as a ground for termination of his parental rights, and states that his incarceration does not constitute a period of "repeated and continued incapacity" as contemplated by the statute.

A review of the applicable case law reveals that, while incarceration cannot serve as the sole ground for termination, it is certainly relevant to the question of incapacity presented under subsection (a)(2). The Pennsylvania Supreme Court addressed this precise issue in In re Adoption of S.P., 47 A.3d 817, 830 (Pa. 2012) (discussing "the relevance of incarceration in termination of parental rights decisions under § 2511(a)(2)."). There, the Supreme Court held as follows:

> [W]e now definitively hold that incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly

17

relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(2).

In re Adoption of S.P., 47 A.3d 817, 830 (Pa. 2012).

The Supreme Court found a that a parent's incarceration could be a determinative factor under the subsection (a)(2) analysis, depending on the specific facts and circumstances that give rise to that parent's incapacity to provide his children with "essential parental care, control or subsistence." Id. at 828. The Supreme Court drew on a prior case addressing subsection (a)(2), in which the concurring opinion stated: "It is beyond cavil that in many cases, including the one at bar, an incarcerated parent is confined twenty-four hours a day, seven days a week; obviously resulting in his being incapable of providing the essential parental care, control or subsistence necessary for a child's physical and mental well-being." Id. (quoting In re R.I.S., 36 A.3d 567, 577-78 (Pa. 2011) (Baer, J., concurring)). Thus, it is clear that Father's current incarceration has some relevancy in determining whether his parental rights should be terminated.

This Court has already discussed Father's lack of pro-active efforts to maintain a relationship with his children before and during his incarceration. As stated above, some of the lack of communication is due to the circumstances of his incarceration. See Section III(a)(3), *supra*. This Court cannot find however, that Father's incarceration is the cause of the children's lack of "essential parental care, control, or subsistence," as Father's inaction predates his period of incarceration. The Court also notes that the children's situation is different from the typical types of cases presented under a subsection (a)(2) inquiry. Prior cases addressing this issue usually deal with children who have been adjudicated dependent, and that dependency being largely due to the parent's incarceration. See, e.g., In re Adoption of S.P., 47 A.3d at 820 ("Father admitted

18

that his incarceration resulted in Child's placement because his absence caused her to be without essential parental care and control."). Such is not the case here. Father was involved sporadically in the children's lives. The two children have been well provided for by Mother and Stepfather, emotionally, physically, and financially, and appear to live a well-adjusted family life.

Thus, the children enjoy a stable life, but that stability was not due to Father. Under the statutory terms, the children have been without the "essential parental care, control, or subsistence" of Father. Father does not have the ability to spend time with the children and perform the regular duties of a parent. Father testified that he does have the ability to make phone calls when telephones are available, and he can write letters when he has the money for the postage. Father's financial situation in jail is tenuous, and this Court was presented with no evidence that he had any ability to financially provide for the children or care for the children while he is in jail. It is clear that Father's current incarceration has necessarily hindered his ability to be a parent. See, e.g., In re A.D., 2014 PA Super 119 (Pa. Super. Ct. June 9, 2014) (father was subject to a no contact order, and thus "by his own conduct was precluded from interacting with the children," and therefore "he was unable to perform his parental duties."). Thus, the "incapacity" level would be met based on Father's inability to parent his children from his current situation. The subsequent and more difficult question is "whether the parent can remedy the incapacity, which depends to a significant degree on the length of the parent's sentence." In re Adoption of S.P., 47 A.3d at 829.

As to the time period of the incapacity, the Court will look at the length of Father's sentence to be served. See In re Adoption of S.P., 47 A.3d at 830 ("[T]he length

19

of the remaining confinement can be considered as highly relevant to whether 'the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.'") (quoting 23 Pa. C.S.A. § 2511(a)(2)). In this case, Father pled guilty to a second degree sexual offense on August 21, 2013 in the Circuit Court of Prince George's County, Maryland. As of the date of this Court's involuntary termination hearing, Father had been incarcerated since August of 2013. At the hearing, Father stated that he was given a sentence of twenty (20) years, all but four (4) years suspended. This Court was not presented with any evidence to suggest that the hindrance on Father's parental abilities will not continue until Father is released, or perhaps even after that. In re Adoption of S.P., 47 A.3d at 831 ("[T]he record supports the trial court's findings regarding the uncertainty of Father's parole date and that, even upon parole, Father would reside in a half-way house and would need to obtain housing, employment and transportation in addition to parenting skills."). The record does contain some uncertainties, however. While presumably Father will serve a period of probation, the length of that probation was not established in the record. Nor were any restrictive terms of that probation. Mother alleges in her brief that, because Father was convicted of sexually assaulting another male, "[w]hether he would be allowed contact with the subject children upon his eventual release is an unanswered question in itself." This is a question the Court does not have enough evidence to make a determination on.[1] While the terms of Father's sentence mean he is only to serve four years, given the already discussed evidence regarding Father's lack of contact and inability to perform as a parent, this Court cannot find that the length of Father's sentence "is not so great as to foreclose

---

[1] In the interests of protecting Father's constitutional rights, the Court instructed the parties to refrain from discussing the details of the offense for which Father was convicted, which included the age of the victim and the specific actions involved.

20

the possibility of the successful maintenance of the parent-child relationship." In re R.I.S., 36 A.3d 567, 574 (Pa. 2011). This Court finds the opposite to be true in this case.

Father's incarceration has made it virtually impossible to provide for the children and perform all the duties required of a parent, and his incarceration will most certainly continue to do so. In the circumstances of this case, the parent-child relationship is not there to maintain. See, e.g., In re Adoption of S.P., 47 A.3d 817, 830-31 (Pa. 2012) ("[T]rial courts must carefully review the individual circumstances for every child to determine, *inter alia,* how a parent's incarceration will factor into an assessment of the child's best interest."). The children have been provided for by Mother and Stepfather. The Court was presented with credible testimony establishing that there is no emotional bond between the children and Father. The children have prospered in their current family situation. This Court has no hesitation in finding that termination of Father's parental rights would serve the best interests of the children. See, e.g., In re I.E.P., 87 A.3d 340, 344 (Pa. Super. 2014) (describing "needs and welfare" analysis under Section 2511(b) under best interests of the child framework). Considering the "developmental, physical, and emotional needs" of the children, it is clear that Father does not have the ability to meet those needs. Those needs have been met by Mother and Stepfather. Therefore, the Court finds that Mother has presented clear and convincing evidence to establish grounds for termination of parental rights under subsection (a)(2), in addition to the grounds under subsection (a)(1) outlined above.

## CONCLUSION

For all the foregoing reasons, this Court finds that grounds for involuntary termination have been established under 23 Pa. C.S.A. § 2511. The Court was presented

21

with clear and convincing evidence to support the termination of Father's parental rights pursuant to subsections (a)(1) and (a)(2).

22

Aug. 5, 2014

# IN THE COURT OF COMMON PLEAS OF THE 39TH JUDICIAL DISTRICT OF PENNSYLVANIA -- FRANKLIN COUNTY BRANCH

In Re Adoption of            :

███████████████   :     ORPHANS' COURT DIVISION

*S.L.E.*               :

                       :     No. 7-ADOPT-2014

                       :

                       :

                       :     Honorable Shawn D. Meyers

---

## OPINION

*M.D.*

This Opinion addresses Petitioner/Mother's, ███████████, petition to terminate

*S.M.E.*

the natural rights of Respondent/Father, ███████████████.

## FACTUAL AND PROCEDURAL HISTORY

*S.L.E.*

The parties are natural parents of two minor children: ███████████████, born

*G.X.E.*

September ●, 2010, and ███████████████, born September ● 2011. Mother and

Father previously resided together with the children. They separated as a couple in May

of 2011, but continued to reside together. Mother is currently married to ███████ *A.A.*

███████ the children's stepfather. He has resided with the children since July of 2012.

Father previously served in the military and was deployed twice. Father was first

deployed to Iraq in 2008. Father served in Afghanistan from May of 2012 - May of

2013, which involved short periods of active service and training. In September of 2011,

Father was arrested for sexual assault of another man in Maryland. Father entered a

guilty plea on July 10, 2013.

Mother filed a Petition for Involuntary Termination of Parental Rights on February 24, 2014, seeking to terminate Father's rights in anticipation of an adoption by Mother's husband, the children's stepfather. This Court set a hearing on May 9, 2014. Upon receipt of pro se correspondence from Father, indicating the desire to proceed with counsel, the Court appointed counsel to represent him. Father's first two appointed attorneys had conflict issues, and the Court subsequently appointed Kristin Nicklas as Father's counsel. The Court continued the hearing to June 3, 2014 in order to ensure that Father had adequate time to consult with his counsel.

The parties appeared on June 3, 2014 for the involuntary termination hearing. The Court heard testimony from both sides, and subsequently set a briefing schedule for the parties. Mother filed her brief in support and Father filed his brief in opposition. This matter is now ready for decision.

## DISCUSSION

I.    Applicable Timeframe for the Court's Determination:

This Court will first address the relevant timeframe for its decision. In his brief, Father raises an argument he previously raised before the Court. At that hearing, counsel for Mother first called Stepfather as a witness. Stepfather was asked several questions about his past involvement with the children and Mother, at which point counsel for Father objected. Counsel for Father argued that the questions reflected content that was not included in the petition, and thus the witness was impermissible testifying to facts not previously pled. The Court sustained the objection in part, finding that if counsel for Mother sought to develop certain facts and to support certain grounds for termination, those facts should have been properly pled in the petition. Counsel for Mother was

3

instructed to move on from questions regarding stepfather's own involvement with the children, and focus on Stepfather's knowledge of Father and his involvement with his children.

In his brief, Father argues that Mother's petition includes only one relevant fact for the Court's consideration: the averment that Father "has had no contact with [Mother] since April 2013 and is currently serving a sentence in Maryland for sex offense(s)." Father argues that Mother is precluded from offering evidence of facts that occurred prior to April 2013 in support of any grounds for termination.

This Court agrees that any potential ground for termination must be sufficiently alleged in the petition. As previously stated at the hearing, any facts regarding Stepfather's prior relationship with the children that were not included in the petition would not be relevant to this Court's determination on Father's parental rights. It is well-settled that "[t]he focus of the termination proceeding is on the conduct of the parent and whether his conduct justifies termination of parental rights." In re B.,N.M., 856 A.2d 847, 854-55 (Pa. Super. 2004). Notably, such conduct includes Father's actions during the six month period preceding the termination petition, but also encompasses the time before that. In re B.,N.M., 856 A.2d at 855 ("Although it is the six months immediately preceding the filing of the petition that is most critical to the analysis, the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision."). The Court will now address the legal grounds for involuntary termination and the evidence submitted by both parties.

4

II.    Applicable Standard – Involuntary Termination of Parental Rights:

Section 2511 of the Adoption Act governs termination of parental rights. The statute requires this Court to engage in a bifurcated analysis to determine if termination is warranted. In interpreting Section 2511, the Pennsylvania Courts have set out this analysis as follows:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

In re I.E.P., 87 A.3d 340, 344 (Pa. Super. 2014) (quoting In re L.M., 923 A.2d 505, 511 (Pa. Super. 2007)). Thus, the Court must first look to the grounds for involuntary termination, and then proceed into the analysis of the needs and welfare of the children.

The grounds for involuntary termination are found in Section 2511(a) of the Adoption Act. In this case, Mother asserts the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa. C.S.A. § 2511(a)(1), (2).

5

The party seeking termination must establish, by clear and convincing evidence, "that grounds existed for terminating Father's parental rights." In re Z.S.W., 946 A.2d 726, 728-29 (Pa. Super. 2008). This means that Mother must present evidence that "is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." In re Z.S.W., 946 A.2d at 728-29 (quoting In re J.D.W.M., 810 A.2d 688, 690 (Pa. Super. 2002)). The Court must consider the totality of the situation, "examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights," in order to determine if termination is warranted by the circumstances. In re B.,N.M., 856 A.2d at 855. With this framework in mind, the Court will now consider Mother's termination petition.

III.     Analysis Under Section 2511(a) - Evidence in Support of Terminating Father's Parental Rights:

      a. **Termination Pursuant to Section 2511(a)(1):**

As stated above, the relevant inquiry under subsection (a)(1) is whether there has been a "settled purpose of relinquishing parental claim" to the minor children by Father, or whether Father has "refused or failed to perform his parental duties." The Pennsylvania Supreme Court has explained "parental duties" as follows:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance. This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

6

In re Burns, 379 A.2d 535, 540 (Pa. 1977) (citations omitted). Thus, the courts place upon a parent an *affirmative* duty. See, e.g., In re B.,N.M., 856 A.2d at 855 ("Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances."). This Court must determine whether Father has "failed or refused to perform parental duties . . . in relation to the particular circumstances of the case." In re Burns, 379 A.2d at 540.

### 1. *Father's Efforts to Contact the Children During his Active Service:*

Mother asserts that Father has not served in his parental role since May of 2012. Mother argues that Father has not provided financial support to the children, or any parental support for the children, for several years. From May 2012 until March 2013, during his period in Afghanistan, Mother avers that Father did not communicate with the children in any way. Father did not attempt to communicate with the children on their birthdays or holidays. Father did not send the children letters, cards, or emails. According to Mother, the only contact Father had with the children was when he sent them each a teddy bear on January 13, 2013. Mother did testify on rebuttal however, that she only recalls two times during the ten months that Father served in Afghanistan did he utilize Skype to communicate with the children.

Father stated that on November 27, 2013, he mailed Mother a letter to read to the children. Father used Mother's address in Maryland, where he believed she was residing. According to Father, the letter was returned to him marked "return to sender." Father then forwarded that letter to Mother's cousin, Marjorie Jean. At the hearing, Ms. Jean testified to this, stating the letter was dated November 27, 2013, addressed to Mother at

7

her address in Hagerstown, Maryland. Father wanted Ms. Jean to send the letter to Mother, but she testified that she did not wish to do that as she was not getting along with Mother at the time. Ms. Jean stated that the "return to sender" on the envelope was in Mother's handwriting. When asked where the envelope was, Ms. Jean said that she shredded the envelope but kept the letter.

Father also presented testimony from Deborah Cotes, Father's aunt. She testified that she sent a package to Mother, containing Christmas gifts for the children, but Mother did not open the package. According to Ms. Cotes, Father knew of the package but it was not actually from him, it was from her.

### 2. *Father's Efforts to Spend Time with the Children Upon his Return*:

In her brief, Mother cites three occasions where Father saw the children. Upon Father's return from Afghanistan in March of 2013, Mother and the children met him at the airport. Mother states that the meeting was brief. It was at that time that Father learned that Mother and the children no longer lived in their former marital home. Two months later, in May of 2013, Father visited with the children for approximately an hour and a half. In June, Father and the children "crossed paths" while visiting a relative's home. According to Mother, that was the extent of Father's efforts to parent or spend time with the children.

Father argues that he attempted to see the children "numerous times, estimated to be approximately twenty (20) times, from May 2013 until he was incarcerated in August 2013." Father does not provide any specific dates or context for that assertion. Father asserts that Mother prohibited contact between he and the children, except for two instances where the parties went to dinner, and where the children spent time with Father

8

at their home. Mother states that neither she nor her husband have acted in any way to prevent Father from exercising his parental rights.

In support of his argument that Mother erected obstacles, Father avers that Marjorie Jean wrote an email to Mother in May of 2013, stating that it was not a good idea for her to "keep the children away from their Father." Father also draws attention to Mother's testimony that the children refer to her husband as "dad" and therefore it would be confusing for them to be involved with their Father.

3. *Father's Efforts to Contact the Children During his Incarceration*:

Father has been incarcerated in Maryland since August of 2013. Father was placed in county jail for approximately two months prior to his incarceration. Father testified that while in county jail, he was unable to send any letters or make any phone calls. Father claims that he pleaded with Mother to see the children prior to his sentencing date in August, but she refused. Father avers that Ms. Jean overheard that conversation. Mother states that Father has not attempted to contact the children while he has been incarcerated.

On direct examination, Father first testified that it was his understanding that because his cell phone was inactivated, that meant Mother's cell phone was also turned off. He stated that he could not call the place of her employment because they do not accept collect calls. Father testified that he asked Ms. Jean to get Mother's work address but she declined to do so. Father did not send any letters to Mother to be forwarded to her address. Father testified that he would ask Ms. Jean if she had heard from the children. Mother stated that she maintains the same work address and phone number she

9

had when she and Father were together, and thus Father had the resources to contact Mother about the children.

On cross-examination by Mother's counsel, Father was asked if, from May 2013 to August 2013, he had taken any steps to enforce his legal rights as a Father, i.e., going through the court system. Father testified in the negative. He indicated that it was not in his nature to "bring it all into the court system like that." He also stated that "at that time, I was too wrapped up in all kinds of legal stuff I didn't want to see any lawyers," presumably referring to the criminal action in Maryland. When asked what he was doing during this time, he stated that he was making preparations "for every possible outcome," which included looking for work and moving to Ms. Jean's home.

On cross-examination by the Guardian ad Litem, Father testified that he did have the ability to make calls from his the facility in Jessup. There does not appear to be a limit on how many calls he can make as an inmate, but there are a limited number of phones to use. Father testified that he can send letters out but he must pay for postage. His family sent him money to buy postage at the jail, if he knew the correct address.

On cross-examination by Mother's counsel, Father was asked about his lack of communication from the time he was arrested until the hearing date. Father indicated that he did not have enough money to send letters to the children prior to November of 2013. Father states in his brief that, because of his unsuccessful attempts at contacting the children, he did not wish to send additional letters or make additional phone calls. He states that Mother erected intentional barriers to his communication which prevented Father from reaching out to his children, and he tried "over and over" to make contact with the children with no success. Because he was not successful in those efforts, Father

10

did not pursue additional efforts. For further explanation, Father cites the definition of insanity attributed to Albert Einstein ("doing the same thing over and over again expecting different results"), and argues that for him to continue the same action (attempting to contact his children) while expecting different results (from Mother) would be insanity.

### 4. *The Court's Findings*:

This Court finds that the threshold under Section 2511(a)(1) has been met. Regarding the time that Father served in Afghanistan, he argues that it is improper to consider that period in support of terminating his parental rights. This Court is not using the mere fact that Father was deployed overseas for a period of time as support of terminating his rights. A parent's deployment overseas is not in itself a supporting factor. See, e.g., In re Bowman, 666 A.2d 274, 279 (Pa. 1995) (recognizing that military service and employment made father's "ability to perform his parental duties more difficult"). Being in active military service however, "do[es] not relieve [the parent] of all parental responsibility." Bowman, 666 A.2d at 279. That parent is required to affirmatively act to "to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." In re B.,N.M., 856 A.2d at 855. The Court finds that Father failed to live up to this affirmative duty. Mother testified as to Father's lack of commination with the children during this time. Father sent no letters to the children, but sent them each a teddy bear near the end of his service time. Mother testified to only two instances during Father's deployment that he communicated with the children via Skype. Father presented testimony that he did send one letter to Mother, by way of her cousin, but it never got to her. Even if this Court accepts that as true, sporadic attempts at communication do not

11

satisfy the affirmative duty of a parent. Father's knowledge of his aunt's Christmas gifts to the children also does not fulfill his obligation, as it was clear that the gift was not actually from Father, but from his aunt.

As to Father's efforts upon his return from Afghanistan up until the hearing date, the Court finds the type of passive acceptance Father has displayed towards his relationship with his children to be troubling, and in complete opposition to what the law requires of a parent. "[T]he parental obligation is a positive duty which requires affirmative performance." In re Burns, 379 A.2d 535, 540 (Pa. 1977). This is an "affirmative duty," that requires "continuing interest in the child and a genuine effort to maintain communication and association with the child." Id. Father's sporadic interaction with his children upon his return from military service does not fulfill this affirmative duty. This duty requires action by the parent.

Father cannot "yield to every problem" that presents itself, and must take steps to maintain the relationship with his children, "to the best of his or her ability, even in difficult circumstances." In re B.,N.M., 856 A.2d at 855. Certainly upon his return Father was faced with difficult circumstances, and the Court acknowledges as such. Father returned to find out that Mother and the children no longer resided in the home. Mother had taken up a relationship with another man. Regardless of those types of difficulties, the law requires a parent to be a parent.

This is true regardless of any "obstacles" put in place by the other parent. As discussed at the hearing, Father had the option of, if nothing else, pursue his legal rights as a parent through the court system. Father's explanation as to why he chose not do to that did not focus on any action by Mother, but on Father's ongoing legal troubles and the

12

unstable nature of his life at that time. This is not a "genuine effort" to maintain contact with the children. Father's claim that any further attempts to contact the children, after numerous failed attempts, would be the definition of insanity does not hold true to this Court. Passive acceptance has no place in the context of an affirmative duty.

The fact that Father is incarcerated is not itself a ground for terminating his parental rights. However, the affirmative parental duty applies even if a parent is incarcerated. In re B.,N.M., 856 A.2d at 855 ("[A] parent's responsibilities are not tolled during incarceration."). The Court must focus on "whether the parent utilized those resources available while in prison to maintain a relationship with his child." In re Adoption of Dale A., II, 683 A.2d 297, 302 (Pa. Super. 1996). Moreover, "while the fact that a parent is incarcerated may make it more difficult to parent in a traditional fashion, the fact of incarceration alone does not obviate the duty to exercise reasonable firmness under the circumstances to maintain a secure parent/child bond." In Interest of A.P., 692 A.2d 240, 245 (Pa. Super. 1997).

The Court finds that this burden was not met here. Father cited numerous reasons for his failure to maintain communication with his children from prison. Father indicated that he was unsure of Mother's current address or telephone number. Mother maintains that none of that information has changed. Father did not present any documentary evidence to the Court showing any changes in address or phone number. Father stated that he asked members of his family for Mother's phone number and asked Ms. Jean for Mother's phone number with no results. Father did not explain why he failed to confirm Mother's address prior to his incarceration, when the parties were living separately. Father testified that he had the means to purchase postage in jail, and the means to send

13

letters from prison, but did not know where to send them. Even if the Court accepts all this as true, Father still had a duty to attempt to overcome the difficulties he faced. See, e.g., In re B.,N.M., 856 A.2d at 857 ("Father failed to act to the best of his ability to meet his obligation despite his incarceration and the obstacles Mother placed before him.").

Father did not send any letters to Mother at her old address to be forwarded to any new address. Father had the means to file something with this Court by mail, or even send a letter to the Court, setting out the situation with the children, but he did not do so. While the failure to seek court involvement is not in itself a reason to terminate a parent's rights, it is certainly a relevant consideration when taken in tandem with all the circumstances of this case. See In re Adoption of L.J.B., 18 A.3d 1098, 1122 (Pa. 2011). The case presented here is not one where one parent has presented diligent, consistent, and resolute efforts to overcome any deliberate and devious obstacles put in place by the custodial parent. In re J.W., 578 A.2d 952, 959 (Pa. Super. 1990) ("[A]dequate parenting requires *action* as well as *intent.*"). This is a case of one parent's passive acceptance of the difficulties put before him; some of which may by the custodial parent, and some of which are the products of the other parent's actions and overall situation. For all the foregoing reasons, this Court finds that there is clear and convincing evidence to support the termination of Father's parental rights under Section 2511(a)(1).

### 5. *Analysis Under Section 2511(b) – Effect of Termination on the Needs and Welfare of the Children*:

As stated above, once the Court has found that that termination of parental rights is warranted, the Court must then determine "the needs and welfare of the child under the standard of best interests of the child." In re D.A.T., 91 A.3d 197, 204 (Pa. Super. 2014) (citation omitted). This inquiry involves consideration of "[i]ntangibles such as love,

14

comfort, security, and stability are involved," as well as "the nature and status of the parent-child bond." In re C.M.S., 884 A.2d 1284, 1287 (Pa. Super. 2005). The Court must consider the effect that terminating Father's parental rights will have on the needs and welfare of the children. In re Adoption of Godzak, 719 A.2d 365, 368 (Pa. Super. 1998). There is great importance to "the bond between a child and his or her natural parent." In re Adoption of Godzak, 719 A.2d at 368 (citing In re E.D.M., 708 A.2d 88 (Pa. 1998). Regarding this consideration, the Superior Court has stated that:

> It is universally agreed that the bond of parental affection is unique and irreplaceable. When parents act in accordance with the natural bonds of parental affection, preservation of the parent-child bond is *prima facie* in the best interest of the child, and the state has no justification to terminate that bond. On the other hand, a court may properly terminate parental bonds which exist *in form* but not *in substance* when preservation of the parental bond would consign a child to an indefinite, unhappy, and unstable future devoid of the irreducible minimum parental care to which that child is entitled.

In re J.W., 578 A.2d 952, 958 (Pa. Super. 1990) (citations omitted). Moreover, "[i]t is important to keep in mind that the essential *needs* of the child and the *responsibilities* of the parent must be considered as well as the *rights* of the parent." Id.

Father argues that the record is devoid of any evidence regarding the effect that termination of his rights would have on the needs and welfare of the children. This Court does not agree. The Court was presented with evidence that the children have no bond whatsoever with Father. Stepfather has lived with Mother and the children since July of 2012. Stepfather testified that the children began referring to him as "dad" around the fall of 2012. He stated that the children have never mentioned natural Father, and testified that he is unsure that the children would even know who Father was. Stepfather testified that he provides for the children, including daily physical and emotional needs. The children embrace Stepfather and Mother as their family, along with their four month

15

old sibling, who is the natural daughter of Stepfather and Mother. The Court was presented with credible evidence that the children currently have a stable and well provided for life with Mother and Stepfather, one filled with "love, comfort, security, and stability." In re C.M.S., 884 A.2d at 1287. The children's needs are being met on a daily basis and they have an established family dynamic.

What is absent from the record is evidence of a bond between the children and natural Father. The Pennsylvania Courts have held that "in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists," and therefore "the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case." In re Adoption of J.M., 991 A.2d 321, 324 (Pa. Super. 2010) (quoting In re K.Z.S., 946 A.2d 753, 762–63 (Pa. Super. 2008)). In this particular case, the Court was presented with evidence that there is no bond between the children and Father. The children's father figure is their Stepfather, who has been children's *de facto* parent for many years, and it is between Stepfather and the children that the Court finds the existence of a parental bond. See, e.g., In re Adoption of J.M., 991 A.2d at 324-25 (finding that maternal grandfather was "*de facto* parent," as he performed Father's parental duties since child's birth, including financial and emotional support, and noting that maternal grandfather "desires to fill the void created by Father's inaction."); In re J.T., 983 A.2d 771, 777 (Pa. Super. 2009) ("[T]here is no record evidence of a bond between J.T. and Mother. A parent-child bond exists between J.T. and her foster parents, who wish to adopt her."). For all the foregoing reasons, this Court cannot find that the children's needs or welfare would be harmed in any way by terminating natural Father's parental rights.

16

### b. Termination Pursuant to Section 2511(a)(2):

This Court will now discuss termination of parental rights under subsection 2511(a)(2), the second statutory ground cited by Mother. Under that section, the relevant inquiry is into the "repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being," as well as the "conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent."

In her brief, Mother draws attention to Father's incarceration. Mother argues that "the fact that ██████ has been and will continue to serve a sentence of incarceration" meets the definition of "incapacity" outlined in Subsection (a)(2). Mother argues that this incapacity is one that cannot be remedied as Father will continue to be incarcerated until he has served his sentence. Father argues that his incarceration cannot be used as a ground for termination of his parental rights, and states that his incarceration does not constitute a period of "repeated and continued incapacity" as contemplated by the statute.

A review of the applicable case law reveals that, while incarceration cannot serve as the sole ground for termination, it is certainly relevant to the question of incapacity presented under subsection (a)(2). The Pennsylvania Supreme Court addressed this precise issue in In re Adoption of S.P., 47 A.3d 817, 830 (Pa. 2012) (discussing "the relevance of incarceration in termination of parental rights decisions under § 2511(a)(2)."). There, the Supreme Court held as follows:

> [W]e now definitively hold that incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly

17

relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(2).

In re Adoption of S.P., 47 A.3d 817, 830 (Pa. 2012).

The Supreme Court found a that a parent's incarceration could be a determinative factor under the subsection (a)(2) analysis, depending on the specific facts and circumstances that give rise to that parent's incapacity to provide his children with "essential parental care, control or subsistence." Id. at 828. The Supreme Court drew on a prior case addressing subsection (a)(2), in which the concurring opinion stated: "It is beyond cavil that in many cases, including the one at bar, an incarcerated parent is confined twenty-four hours a day, seven days a week; obviously resulting in his being incapable of providing the essential parental care, control or subsistence necessary for a child's physical and mental well-being." Id. (quoting In re R.I.S., 36 A.3d 567, 577-78 (Pa. 2011) (Baer, J., concurring)). Thus, it is clear that Father's current incarceration has some relevancy in determining whether his parental rights should be terminated.

This Court has already discussed Father's lack of pro-active efforts to maintain a relationship with his children before and during his incarceration. As stated above, some of the lack of communication is due to the circumstances of his incarceration. See Section III(a)(3), *supra*. This Court cannot find however, that Father's incarceration is the cause of the children's lack of "essential parental care, control, or subsistence," as Father's inaction predates his period of incarceration. The Court also notes that the children's situation is different from the typical types of cases presented under a subsection (a)(2) inquiry. Prior cases addressing this issue usually deal with children who have been adjudicated dependent, and that dependency being largely due to the parent's incarceration. See, e.g., In re Adoption of S.P., 47 A.3d at 820 ("Father admitted

18

that his incarceration resulted in Child's placement because his absence caused her to be without essential parental care and control."). Such is not the case here. Father was involved sporadically in the children's lives. The two children have been well provided for by Mother and Stepfather, emotionally, physically, and financially, and appear to live a well-adjusted family life.

Thus, the children enjoy a stable life, but that stability was not due to Father. Under the statutory terms, the children have been without the "essential parental care, control, or subsistence" of Father. Father does not have the ability to spend time with the children and perform the regular duties of a parent. Father testified that he does have the ability to make phone calls when telephones are available, and he can write letters when he has the money for the postage. Father's financial situation in jail is tenuous, and this Court was presented with no evidence that he had any ability to financially provide for the children or care for the children while he is in jail. It is clear that Father's current incarceration has necessarily hindered his ability to be a parent. See, e.g., In re A.D., 2014 PA Super 119 (Pa. Super. Ct. June 9, 2014) (father was subject to a no contact order, and thus "by his own conduct was precluded from interacting with the children," and therefore "he was unable to perform his parental duties."). Thus, the "incapacity" level would be met based on Father's inability to parent his children from his current situation. The subsequent and more difficult question is "whether the parent can remedy the incapacity, which depends to a significant degree on the length of the parent's sentence." In re Adoption of S.P., 47 A.3d at 829.

As to the time period of the incapacity, the Court will look at the length of Father's sentence to be served. See In re Adoption of S.P., 47 A.3d at 830 ("[T]he length

19

of the remaining confinement can be considered as highly relevant to whether 'the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.'") (quoting 23 Pa. C.S.A. § 2511(a)(2)). In this case, Father pled guilty to a second degree sexual offense on August 21, 2013 in the Circuit Court of Prince George's County, Maryland. As of the date of this Court's involuntary termination hearing, Father had been incarcerated since August of 2013. At the hearing, Father stated that he was given a sentence of twenty (20) years, all but four (4) years suspended. This Court was not presented with any evidence to suggest that the hindrance on Father's parental abilities will not continue until Father is released, or perhaps even after that. In re Adoption of S.P., 47 A.3d at 831 ("[T]he record supports the trial court's findings regarding the uncertainty of Father's parole date and that, even upon parole, Father would reside in a half-way house and would need to obtain housing, employment and transportation in addition to parenting skills."). The record does contain some uncertainties, however. While presumably Father will serve a period of probation, the length of that probation was not established in the record. Nor were any restrictive terms of that probation. Mother alleges in her brief that, because Father was convicted of sexually assaulting another male, "[w]hether he would be allowed contact with the subject children upon his eventual release is an unanswered question in itself." This is a question the Court does not have enough evidence to make a determination on.[1] While the terms of Father's sentence mean he is only to serve four years, given the already discussed evidence regarding Father's lack of contact and inability to perform as a parent, this Court cannot find that the length of Father's sentence "is not so great as to foreclose

---

[1] In the interests of protecting Father's constitutional rights, the Court instructed the parties to refrain from discussing the details of the offense for which Father was convicted, which included the age of the victim and the specific actions involved.

20

the possibility of the successful maintenance of the parent-child relationship." In re R.I.S., 36 A.3d 567, 574 (Pa. 2011). This Court finds the opposite to be true in this case.

Father's incarceration has made it virtually impossible to provide for the children and perform all the duties required of a parent, and his incarceration will most certainly continue to do so. In the circumstances of this case, the parent-child relationship is not there to maintain. See, e.g., In re Adoption of S.P., 47 A.3d 817, 830-31 (Pa. 2012) ("[T]rial courts must carefully review the individual circumstances for every child to determine, *inter alia,* how a parent's incarceration will factor into an assessment of the child's best interest."). The children have been provided for by Mother and Stepfather. The Court was presented with credible testimony establishing that there is no emotional bond between the children and Father. The children have prospered in their current family situation. This Court has no hesitation in finding that termination of Father's parental rights would serve the best interests of the children. See, e.g., In re I.E.P., 87 A.3d 340, 344 (Pa. Super. 2014) (describing "needs and welfare" analysis under Section 2511(b) under best interests of the child framework). Considering the "developmental, physical, and emotional needs" of the children, it is clear that Father does not have the ability to meet those needs. Those needs have been met by Mother and Stepfather. Therefore, the Court finds that Mother has presented clear and convincing evidence to establish grounds for termination of parental rights under subsection (a)(2), in addition to the grounds under subsection (a)(1) outlined above.

## CONCLUSION

For all the foregoing reasons, this Court finds that grounds for involuntary termination have been established under 23 Pa. C.S.A. § 2511. The Court was presented

21

with clear and convincing evidence to support the termination of Father's parental rights pursuant to subsections (a)(1) and (a)(2).

6 pgs    TCO #3

Oct. 1, 2014

**IN THE COURT OF COMMON PLEAS OF THE 39TH JUDICIAL DISTRICT
OF PENNSYLVANIA – FRANKLIN COUNTY BRANCH**

In Re: Adoption of             :       Orphans' Court
G. X. E.                   :
                            :       No. 6-ADOPT-2014
                            :
                            :       Judge: Shawn D. Meyers

## OPINION

The trial court has received a Notice of Appeal and Concise Statement of Errors

Complained of on Appeal filed in the above-captioned action. This opinion and statement by the

Court is offered within the time provisions required by and for a Children's Fast Track Appeal.

The Court notes it does not have the benefit of the trial transcript in issuing its opinion, but does

not believe that such a transcript is necessary for this Court to provide responses to the issues

raised by Father as part of his appeal.

Father has raised seven (7) issues on appeal. This Court believes that the Order of Court

of August 5, 2014, to which an opinion numbering 22 pages in length already provides adequate

explanation to many of the issues raised by Father in his Statement of Matters Complained of on

Appeal. Specifically, the following issues raised by Father have already been addressed, and this

trial court urges the Appellate Court to accept the findings of fact of the trial court and the rationale set forth in the opinion entered on August 5, 2014.

**Issue #1** - The first issue raised by Father is whether or not the trial court's decision to terminate Father's parental rights is not supported by clear and convincing evidence and constitutes an abuse of discretion for the following reasons:

(a) Father alleges there is insufficient evidence to determine the Father's conduct continuing for a period of at least six months immediately preceding the filing of the petition either evidenced a settled purpose of relinquishing parental claim to the child, or failed to perform parental duties.

This issue is specifically answered and addressed in the Court's analysis on pages 5 through 14 of the opinion dated August 5, 2014.

**Issue #2** – In the second issue, Father alleges there was insufficient evidence to determine a repeated and continued incapacity, abuse, neglect, or refusal of Father has caused the child to be without essential parental care, control, or subsistence necessary for his physical or mental well-being, and the conditions and causes of the incapacity, abuse, neglect, or refusal cannot or will not be remedied by Father.

The Court has specifically answered this issue in pages 17 through 22 of its previously issued opinion dated August 5, 2014.

**Issue #3** – The third issue raised by Father is that the trial court failed to address the required analysis under Section 2511(b) in the Decree. The Court directs the Appellate Court to the trial court order and opinion of August 5, 2014, in which the Court recited it had held a hearing on Petitioner's Petition for Involuntary Termination of Parental Rights, and that it found

grounds for involuntary termination of parental rights which was established by clear and convincing evidence. Furthermore, the Court directs the Appellate Court to pages 11 through 14 of the opinion which recites findings of the Court, which this Court believes are clearly supported by the facts set forth in the transcript when filed by the stenographer. The trial court proceeded to analyze the case under Section 2511(b), which is contained within its opinion on pages 14 through 16. As is clearly outlined in the order of August 5, 2014, the Court directed that the Petitioner submit an appropriate decree for execution by the Court. This Court submits that the decree ultimately submitted by the Petitioner and containing the conclusions generally references Section 2501 of the Adoption Code. The Court's specific findings and opinion of August 5, 2014 specifically address the Section 2511(b) criteria. To the extent that there is an omission in the Final Decree as to 2511(b) findings, they are remedied by the Court's prior findings and statements in the August 5, 2014 opinion and order. To the extent that the trial court may be required to issue an amended decree, it is urged that the Appellate Court order that an amended decree be permitted to be entered, but that it would be admitted with prejudice so that there would be no further appeal as the issues were substantively addressed by the trial court in its opinion and order of August 5, 2014.

**Issue #4** – Did the trial court err by not giving primary consideration to the developmental, physical, and emotional needs and welfare of the child in terminating Father's rights?

Again, this Court directs the Appellate Court to its opinion and order of August 5, 2014. The Court directs the Appellate Court to pages 14 through 16, which enumerate the Court's findings which this Court asserts is supported by clear and convincing evidence in the record as

3

to step-father's involvement, along with natural mother in the raising of the children, which combine with a lack of any record of Father's involvement in his children's lives in the six months preceding the filing of the petition, that this Court did consider the development of physical and emotional needs and welfare of the children before deciding to terminate Father's rights.

Issue #5 – Did the trial court err in finding that legal grounds exist for the involuntary termination of the parental rights of Terence Tobler? To Father's knowledge, Terence Tobler is not a party or witness to the instant matter.

Per the order entered August 5, 2014, the trial court directed trial counsel to submit a typed decree for execution by the Court. This Court asserts that Petitioner included incorrect names in the Final Decree that the trial court did not notice. This is a scrivener's error that should in no way impact the Court's decision of August 5, 2014. In fact, the Court clearly outlined who Father was in its opinion and order of August 5, 2014. To the extent that the Petitioner's counsel submitted a decree that incorrectly identified a party, this Court asserts that such error should not be a reason to set aside the Final Decree. Rather, the trial court should be granted the opportunity to issue an amended decree clarifying the order, but that that amended decree would not entitle Father to additional right of review or appeal provided the Appellate Court agrees with the substantive analysis of the trial court raised by Father.

Issue #6 – Did the trial court err in finding that Mother is single. Mother is married and was married and was married at the time of hearing?

The Court points the Appellate Court to its opinion, page 2, Factual and Procedural History, in which the Court clearly finds that Mother is currently married to████████████, the

4

children's step-father. To the extent the decree submitted by Petitioner's counsel to the Court for signature referenced that Mother was single, that is a factual misstatement attributed to Petitioner's counsel. To the extent the trial court failed to correct that error before signing the decree, the Court asks for permission from the Appellate Court to issue an amended decree, but upon issuance of such amended decree, it would not enlarge the time for appeal of this issue or review, so long as the substantive issues are being reviewed by the Appellate Court as part of the Fast Track Appeal.

**Issue #7** –Father asserts that the trial court erred in using and considering excluded evidence, specifically events prior to April, 2013 in its determination to terminate Father's parental rights.

This Court believes a review of the record will reveal that the Court did limit certain testimony by Petitioner that might have attempted to enlarge the amount of time included or outlined or described in the petition for involuntary termination of parental rights. However, that being said, this Court considers the involvement prior to April, 2013 of Mother with step-father to be incidental. The trial court conducted a specific review of the six months prior to the filing of petition, which revealed that Mother was involved in a committed relationship with her husband, the children's step-father, and that he was the one who was supplying the parental guidance and support to the children. This Court believes that the record is replete with information showing the lack of involvement of Father in the six months preceding the petition and the active involvement of step-father, and that to the extent this Court may have relied upon any information prior to April, 2013, that this Court finds that to be an incidental or harmless error as there was more than overwhelming and clear and convincing evidence of the lack of

5

Father's involvement during the six months prior to the filing of petition, and the active

involvement of step-father during that time.

By the Court,

J.

*Oct. 1, 2014*

## IN THE COURT OF COMMON PLEAS OF THE 39TH JUDICIAL DISTRICT OF PENNSYLVANIA – FRANKLIN COUNTY BRANCH

In Re: Adoption of             :     Orphans' Court
S. L. E.                       :
                              :     No. 7-ADOPT-2014
                              :
                              :     Judge: Shawn D. Meyers

## OPINION

The trial court has received a Notice of Appeal and Concise Statement of Errors Complained of on Appeal filed in the above-captioned action. This opinion and statement by the Court is offered within the time provisions required by and for a Children's Fast Track Appeal. The Court notes it does not have the benefit of the trial transcript in issuing its opinion, but does not believe that such a transcript is necessary for this Court to provide responses to the issues raised by Father as part of his appeal.

Father has raised seven (7) issues on appeal. This Court believes that the Order of Court of August 5, 2014, to which an opinion numbering 22 pages in length already provides adequate explanation to many of the issues raised by Father in his Statement of Matters Complained of on Appeal. Specifically, the following issues raised by Father have already been addressed, and this

trial court urges the Appellate Court to accept the findings of fact of the trial court and the rationale set forth in the opinion entered on August 5, 2014.

**Issue #1** - The first issue raised by Father is whether or not the trial court's decision to terminate Father's parental rights is not supported by clear and convincing evidence and constitutes an abuse of discretion for the following reasons:

(a) Father alleges there is insufficient evidence to determine the Father's conduct continuing for a period of at least six months immediately preceding the filing of the petition either evidenced a settled purpose of relinquishing parental claim to the child, or failed to perform parental duties.

This issue is specifically answered and addressed in the Court's analysis on pages 5 through 14 of the opinion dated August 5, 2014.

**Issue #2** – In the second issue, Father alleges there was insufficient evidence to determine a repeated and continued incapacity, abuse, neglect, or refusal of Father has caused the child to be without essential parental care, control, or subsistence necessary for his physical or mental well-being, and the conditions and causes of the incapacity, abuse, neglect, or refusal cannot or will not be remedied by Father.

The Court has specifically answered this issue in pages 17 through 22 of its previously issued opinion dated August 5, 2014.

**Issue #3** – The third issue raised by Father is that the trial court failed to address the required analysis under Section 2511(b) in the Decree. The Court directs the Appellate Court to the trial court order and opinion of August 5, 2014, in which the Court recited it had held a hearing on Petitioner's Petition for Involuntary Termination of Parental Rights, and that it found

2

grounds for involuntary termination of parental rights which was established by clear and convincing evidence. Furthermore, the Court directs the Appellate Court to pages 11 through 14 of the opinion which recites findings of the Court, which this Court believes are clearly supported by the facts set forth in the transcript when filed by the stenographer. The trial court proceeded to analyze the case under Section 2511(b), which is contained within its opinion on pages 14 through 16. As is clearly outlined in the order of August 5, 2014, the Court directed that the Petitioner submit an appropriate decree for execution by the Court. This Court submits that the decree ultimately submitted by the Petitioner and containing the conclusions generally references Section 2501 of the Adoption Code. The Court's specific findings and opinion of August 5, 2014 specifically address the Section 2511(b) criteria. To the extent that there is an omission in the Final Decree as to 2511(b) findings, they are remedied by the Court's prior findings and statements in the August 5, 2014 opinion and order. To the extent that the trial court may be required to issue an amended decree, it is urged that the Appellate Court order that an amended decree be permitted to be entered, but that it would be admitted with prejudice so that there would be no further appeal as the issues were substantively addressed by the trial court in its opinion and order of August 5, 2014.

**Issue #4** – Did the trial court err by not giving primary consideration to the developmental, physical, and emotional needs and welfare of the child in terminating Father's rights?

Again, this Court directs the Appellate Court to its opinion and order of August 5, 2014. The Court directs the Appellate Court to pages 14 through 16, which enumerate the Court's findings which this Court asserts is supported by clear and convincing evidence in the record as

3

to step-father's involvement, along with natural mother in the raising of the children, which combine with a lack of any record of Father's involvement in his children's lives in the six months preceding the filing of the petition, that this Court did consider the development of physical and emotional needs and welfare of the children before deciding to terminate Father's rights.

Issue #5 – Did the trial court err in finding that legal grounds exist for the involuntary termination of the parental rights of Terence Tobler? To Father's knowledge, Terence Tobler is not a party or witness to the instant matter.

Per the order entered August 5, 2014, the trial court directed trial counsel to submit a typed decree for execution by the Court. This Court asserts that Petitioner included incorrect names in the Final Decree that the trial court did not notice. This is a scrivener's error that should in no way impact the Court's decision of August 5, 2014. In fact, the Court clearly outlined who Father was in its opinion and order of August 5, 2014. To the extent that the Petitioner's counsel submitted a decree that incorrectly identified a party, this Court asserts that such error should not be a reason to set aside the Final Decree. Rather, the trial court should be granted the opportunity to issue an amended decree clarifying the order, but that that amended decree would not entitle Father to additional right of review or appeal provided the Appellate Court agrees with the substantive analysis of the trial court raised by Father.

Issue #6 – Did the trial court err in finding that Mother is single. Mother is married and was married and was married at the time of hearing?

The Court points the Appellate Court to its opinion, page 2, Factual and Procedural History, in which the Court clearly finds that Mother is currently married to ███████████, the

4

children's step-father. To the extent the decree submitted by Petitioner's counsel to the Court for signature referenced that Mother was single, that is a factual misstatement attributed to

Petitioner's counsel. To the extent the trial court failed to correct that error before signing the decree, the Court asks for permission from the Appellate Court to issue an amended decree, but upon issuance of such amended decree, it would not enlarge the time for appeal of this issue or review, so long as the substantive issues are being reviewed by the Appellate Court as part of the Fast Track Appeal.

Issue #7 --Father asserts that the trial court erred in using and considering excluded evidence, specifically events prior to April, 2013 in its determination to terminate Father's parental rights.

This Court believes a review of the record will reveal that the Court did limit certain testimony by Petitioner that might have attempted to enlarge the amount of time included or outlined or described in the petition for involuntary termination of parental rights. However, that being said, this Court considers the involvement prior to April, 2013 of Mother with step-father to be incidental. The trial court conducted a specific review of the six months prior to the filing of petition, which revealed that Mother was involved in a committed relationship with her husband, the children's step-father, and that he was the one who was supplying the parental guidance and support to the children. This Court believes that the record is replete with information showing the lack of involvement of Father in the six months preceding the petition and the active involvement of step-father, and that to the extent this Court may have relied upon any information prior to April, 2013, that this Court finds that to be an incidental or harmless error as there was more than overwhelming and clear and convincing evidence of the lack of

5

Father's involvement during the six months prior to the filing of petition, and the active involvement of step-father during that time.

By the Court,

_____

J.

6